2020 IL App (1st) 172106-U
No. 1-17-2106

SECOND DIVISION
June 9, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 12 CR 18153 |
| | ) | |
| ALAN PADILLA, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Thomas J. Byrne, |
| | ) | Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1     *Held:* The judgment of the trial court is reversed, where the defendant was a juvenile offender, and the trial court imposed a discretionary *de facto* life sentence without making a finding that the defendant was beyond rehabilitation so that he was among the rarest of juveniles whose crimes reflect permanent incorrigibility.

¶ 2     Alan Padilla was convicted in a jury trial for first degree murder, and was sentenced to 65 years' imprisonment. On appeal, he argues that his discretionary *de facto* life sentence violates the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11), where he

was 17 years old at the time of the offense and the trial court failed to make a determination as to whether he was "among the rarest of youth whose crimes reflect permanent incorrigibility." We reverse and remand with instructions.

¶ 3    BACKGROUND

¶ 4    Padilla was charged by indictment with six counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2012)), following an incident in Chicago, Illinois, on August 31, 2012. Prior to trial, the State nolle prossed four of the six counts.

¶ 5    Also prior to trial, Padilla brought a motion to declare the sentencing scheme for his charges unconstitutional as applied to Padilla, where Padilla was a minor at the time of the offense and his charges carried a statutory minimum of 45 years and a maximum sentence of natural life in prison. Padilla requested that the trial court (1) hold that the sentencing scheme for Padilla's charges is unconstitutional and (2) "consider a sentence that comports, at a minimum, with the sentencing scheme under the Juvenile Court Act *** to a maximum of thirty-nine years." Padilla's constitutional challenge to the sentencing scheme was not addressed until after Padilla's jury trial.

¶ 6    Because the issue on appeal concerns the constitutionality of Padilla's sentence, we set forth a brief summary of the facts adduced at trial, which commenced on December 13, 2016. The record shows that the victim of the murder, Jalen Stogner, was a 17-year-old African American teenager, and the State presented evidence regarding Padilla's motive in order to show that Jalen was targeted in the murder specifically because of his race, as we will describe.

¶ 7    Jalen's mother, Marla Stogner, testified that on August 31, 2012, around 4 p.m., she drove to a laundromat on 47th Street and Ashland Avenue with Jalen and two of her other four children. She parked her vehicle in front of the laundromat, and Jalen took a laundry bag from the vehicle and stood in the laundromat doorway. Padilla, whom Marla had never seen before, walked 12 to

15 feet from Jalen and "said something" to Jalen. Jalen asked Padilla what he said. Marla testified that Jalen did not "reach for anything," have a firearm, or "go after" Padilla. Rather, Marla told Jalen not to argue, and told Padilla that Jalen "wasn't here for any trouble."

¶ 8    Padilla then lifted his shirt, pulled out a firearm, and aimed it at Jalen. Jalen turned and ran inside the laundromat, and Padilla shot the firearm three times. Marla "scream[ed]," "begg[ed]," and told Padilla, "That's my son." Padilla stared and pointed his firearm at Marla, but turned around and ran down an alley near the laundromat. Marla entered the laundromat and saw Jalen unresponsive and "falling on the floor." She turned Jalen to his side, and "blood *** spilled out of his mouth." Police officers took Jalen to the hospital in an ambulance, and Marla learned that Jalen had died. At the police station, Marla identified Padilla from a lineup. Marla also testified regarding video footage recovered from the laundromat that depicted the incident.

¶ 9    DeShawn Sims, one of Marla's children, testified in corroboration with Marla. The State also presented the testimony of two customers, who both testified that they saw Padilla walking around the laundromat "nervous." The two customers both heard gunshots, and saw Jalen enter the laundromat bleeding and fall to the ground. A laundromat employee corroborated this testimony, but added that she also saw Padilla argue with another man outside the laundromat prior to the incident. She also added that when Padilla was walking around the laundromat and looking nervous, he did not wash or carry any laundry during his visit. The two customers and the laundromat employee all identified Padilla from a lineup. The witnesses who were at the scene all consistently testified that Padilla was wearing a white shirt and blue, or jean, shorts.

¶ 10    The State also presented testimony that police officers investigated the scene just after 4 p.m., and found Padilla about four blocks away from the laundromat, on the railroad tracks on top of a viaduct. Padilla was holding black socks in his hand, and he wore a different "blueish black"

shirt, and denim jeans. Padilla also held a cell phone with the battery removed. An officer asked Padilla what he was doing on the tracks, and Padilla stated, "Just chilling." The police recovered Padilla's cell phone, arrested Padilla, and took him to the police station.

¶ 11    The State also submitted testimony that Jalen had a bullet wound entering the right side of the back of his chest, and the bullet lodged in his lower right lung cavity.

¶ 12    An inmate at the Cook County jail testified that he heard Padilla rapping "[a]bout killing a n***." The inmate remarked on the song, and asked Padilla why he was in prison. Padilla stated he had been in an altercation with a black man on 48th and Ashland and left to retrieve his firearm. Padilla returned to the area "[t]o kill a n***," but did not see that black man, so he "look[ed] for a n*** to kill" and "found him." Padilla then told the inmate he killed a "n***" who was "walking his laundry into the [l]aundromat" by shooting him twice. Afterwards, Padilla left the scene and urinated on his hands. Padilla additionally told the inmate he was going to "[b]eat the murder rap" and plea insanity. The court admonished the jury, and stated that the inmate's testimony regarding any of Padilla's conduct not included in Padilla's charges was received on the issue of motive only. The court told the jury it was their role to determine whether that conduct occurred.

¶ 13    The State rested, and Padilla testified.

¶ 14    Padilla stated that at the time of the incident, he was 17 years old and homeless, his father's location was unknown, and his mother had been deported to Mexico. Thirty minutes before the incident, a man punched Padilla and tried to rob him, and Padilla ran into the laundromat. Padilla left the laundromat and passed Jalen, who said to Padilla, " 'What are you looking at?' " Padilla did not say anything, and Jalen told Padilla, " 'I'm going to kill you.' " Padilla stated he believed Jalen's threat due to the prior altercation he had experienced. Padilla walked away from Jalen, but

Jalen called, "Yo, yo." Padilla turned around and saw Jalen reach into his waistband. Padilla thought Jalen had a firearm, shot Jalen twice, and ran into an alley.

¶ 15    On cross-examination, Padilla confirmed that he never saw Jalen with a firearm, and that Jalen was holding a laundry bag when they interacted. Padilla also confirmed that he initially gave the police an alibi, saying he was at a McDonald's when the shooting occurred.

¶ 16    The jury found Padilla guilty of first degree murder, and found that during the commission of the offense of first degree murder, Padilla personally discharged a firearm that proximately caused death to another person.

¶ 17    Before Padilla's sentencing hearing, the trial court heard arguments regarding Padilla's motion to declare the sentencing scheme of Padilla's charges unconstitutional. The trial court observed that a change in the law had altered the "crux" of Padilla's motion, since the applicable firearm enhancement was no longer mandatory.

¶ 18    Defense counsel argued that any sentence over 39 years is a *de facto* natural life sentence, and that "regardless of whether the 25 to life imposition is discretionary, *** any enhancement for a juvenile beyond the 25 years would be unconstitutional." The State responded that the United States Supreme Court only held that a life sentence for a juvenile offender should not be mandatory. A court may still impose a discretionary natural life sentence, as long as the judge had considered the juvenile offender's youth and its attendant circumstances.

¶ 19    The trial court denied Padilla's motion to declare the sentencing scheme unconstitutional, and proceeded to Padilla's sentencing hearing.

¶ 20    At the sentencing hearing, the trial court initially noted that Padilla was previously diagnosed with a mental disorder, and that it had ordered an evaluation of Padilla's fitness. A forensic psychologist concluded that Padilla was fit to stand trial, but "was unable to render an

opinion with any degree of psychiatric certainty" due to Padilla's lack of cooperation, which "was not the result of any mental illness."

¶ 21    In aggravation, the State presented Chicago police officer Dwayne Gross, who testified that on August 31, 2012, at about 10:50 p.m., he searched and processed Padilla following Padilla's arrest. As Gross "took [Padilla] over" to be fingerprinted, Padilla "got into a verbal altercation" with Gross's partner, Officer Lawrence Foote. Padilla told Foote that Padilla "wanted to fight him, and *** was going to f*** him up." On September 1, 2012, at about 11:15 p.m., Padilla "became agitated" when he saw Foote and yelled that he "wanted to f*** [Foote] up." Gross attempted to guide Padilla towards a cell, and Padilla punched Gross in the chest. Gross then claimed that he and Padilla "used direct mechanics." Officers moved Padilla to his cell, and Padilla tried to "squirm away." Gross suffered a fractured left hand due to the incident.

¶ 22    On cross-examination, Gross confirmed that "direct mechanics" meant punching, and that he broke his hand punching Padilla.

¶ 23    Chicago police officer Deborah Jovanovich corroborated Gross's account of this altercation, and added that she suffered a cut on her wrist and a jammed finger assisting Gross.

¶ 24    Chicago correctional officer Richard O'Connor testified that on September 21, 2012, at about 9 p.m., he worked in the Cook County Department of Corrections, when Padilla sprayed a substance onto O'Connor's right side and face. O'Connor believed the substance was a mixture of urine and feces based on its smell and color. Chicago correctional officer Arcenio Pizana testified that on February 8, 2016, at about 9 a.m., Padilla refused to reenter his cell, and staff members physically "escorted" him to his cell. Two hours later, Padilla threw a liquid substance onto Pizana's back. The next day, Padilla called Pizana a "b***" and told Pizana, "I should beat your ass." Padilla advanced towards Pizana, and Pizana deployed pepper spray at him. Chicago

correctional officer Thomas Maciunas testified that on March 15, 2016, at about 10 a.m., he saw Padilla fight with another inmate and ordered Padilla to stop. Padilla did not stop, so Maciunas "[u]tilized [pepper] spray."

¶ 25    Lieutenant Michael Hallihan, a "Watch Commander" with the Cook County Sheriff's Department, testified that Padilla's inmate discipline reports, which reflected about 20 instances in which Padilla was disciplined for misconduct, which included fighting with inmates, refusing to comply with orders, attempting to escape, assaulting staff, damaging property in his cell, or possessing contraband, specifically shanks and batches of "hooch," which was described as "inmate made alcohol, using lunch products."

¶ 26    Mark Washington, Jalen's father, read a victim impact statement describing the hardship he faced after his son died, and stating that he had lost his only son "to the historical ongoing racism and gun violence in America." Washington stated, "This cowardice murderer sitting here, should know what it's like to get life without parole for his racist senseless first degree murder."

¶ 27    The defense presented in mitigation Dolci Vasquez, Padilla's mother, who stated that she was 14 years old when she met Padilla's father and became pregnant with Padilla. Two years later, Padilla's father left for Mexico. Vasquez's own father then assumed a father figure role for Padilla. Vasquez met another man, with whom she had a daughter, but the second man "was very abusive" and "would beat [Vasquez] up" and "humiliate" her. Vasquez then returned to her parents with her daughter and Padilla. After "[s]ome time," Vasquez met her boyfriend, Luis, and lived with him.

¶ 28    Padilla attended school and was diagnosed with attention-deficit hyperactivity disorder (ADHD). Vasquez stated that they changed Padilla's medication dosage "all the time," and Padilla "had no stability in his emotions." Vasquez then sent Padilla to a "Masonic School for his behavior," and "[e]verything changed," as Padilla put more effort into his studies. Vasquez's father

then died, and Padilla "was devastated," "did not accept the loss," and "became more rebellious." Padilla received "stronger medicine so that he could be at peace."

¶ 29    Vasquez stated that she later moved to Mexico with Luis, Padilla, and her daughter. Luis became abusive, beat Vasquez, and "use[d] drugs." Vasquez testified that Padilla once tried to defend Vasquez from Luis, became upset, and left for a party. When Padilla returned from the party, Padilla told Vasquez he had fallen asleep and was "almost raped by a man."

¶ 30    Vasquez then returned to Chicago and sent Padilla to be with her family. She grew dependent on alcohol, enrolled in a self-help group, and took her children to Alcoholics Anonymous meetings so they could see she "wanted to give them the best possible life for them." One night, while Vasquez was driving her children back from a "spiritual retreat," the police detained Vasquez, and Padilla yelled at the police not to "beat [her] up."

¶ 31    Vasquez was deported to Mexico. She testified that she knew this event was traumatic for Padilla, and decided her children would stay with her sister, Wendy Fernandez, because Padilla "was extremely upset and started to get involved with problems." However, the Department of Children and Family Services took custody of Vasquez's children away from Fernandez, and Padilla "lived at a school." Vasquez stated, "I know that my Son felt the abandonment on my part, because he always felt it relative to his Father." According to Vasquez, Padilla was "looking for love," but found it "with the wrong kinds of people, such [as] gangs." Vasquez stated that Padilla was a child who did not have his mother or father, and that "the only thing he could do was to survive on the streets." Vasquez asked that the trial court "have compassion and comprehension."

¶ 32    The defense also presented a letter from Fernandez, Vasquez's sister, who stated that Padilla is a "good person," and that "life has *** treated him very badly." Fernandez stated, "I am certain that there has been much suffering in spite of his young age." Fernandez further stated that

Padilla's lack of a father figure affected him. Padilla suffered from "an impediment" from a young age, and while he liked to play, "feel free," and "do everything that [a] young child likes to do," his medication "paralyze[d]" and "sedated" him. He was a "highly intelligent child" who "always had perfect grades," but would behave differently when he did not take his medication. Fernandez stated that Padilla "was a very good boy," who would tell her "he was going to study very hard to become someone in life" and to "return to his [m]other everything that she had done for him and for his [s]ister." Unfortunately, Padilla made "questionable friends," and "started to *** behave badly." When his mother was deported, Padilla frequently cried and "was always sad." Fernandez acknowledged that what Padilla did could not be "justified," but stated that he was simply "in a moment and place that were wrong for him." Fernandez concluded that Padilla was "only an adolescent" and was "extremely remorseful" for what he did.

¶ 33    The defense also presented a letter from Padilla's grandmother, Maria Vasquez, who stated that Padilla was "very respectful," "applied himself," and "had a wonderful attitude." Maria Vasquez stated that Padilla had "bad friends who turned him like this," and that he lacked "the love of his [f]ather." She stated that Padilla "is in the flower of his youth, full of life," and asked that the circuit court "show him clemency, because we would assume charge, and take care of him, to guide him on a right and correct path, so that he can become an honest man."

¶ 34    Additionally, the defense submitted Padilla's school records, which showed that Padilla got "A's and B's." The defense presented a report from Sullivan High School, in which Padilla's English teacher stated that Padilla had an A in English and had completed 90% of his assignments and had attended class. The teacher further reported that Padilla "likes to participate in class," works well in groups, "learn[s] well through discussion," and "tend[s] to curse a lot in in class"

but "always apologizes and stops." The teacher further voiced concern that Padilla's "outside friendships may be affecting his focus."

¶ 35    The trial court also considered the presentencing investigative report (PSI), which stated that Padilla's birth date was October 4, 1994, confirming that Padilla was 17 years old at the time of the offense. The PSI also stated that Padilla's father's location was unknown, that his mother was in Aurora, Illinois, and that he had one maternal sibling. Padilla was raised by his mother and maternal grandparents, and he had a " 'good' " relationship with his mother, a close relationship with his sister, and no relationship with his father. He described his childhood as " 'bad' " after his grandfather passed away, and denied ever being abused or neglected. At age 15, Padilla was placed in a "group home" after his mother's deportation. Padilla denied that his family had a history of drug or alcohol abuse, or that he had family members in prison or on probation.

¶ 36    According to the PSI, Padilla's highest level of education was ninth grade, and he reported he received A's and B's and participated in the basketball team. Padilla was "expelled and suspended for fighting." Padilla denied having any monthly income or expenses prior to incarceration, but stated he sold drugs to support himself. The PSI also stated that Padilla was a member of the gang La Raza from 2010 to the present date and went by the street name " 'Dangerous,' " and he ranked as a "foot soldier." Additionally, the PSI reflected that Padilla had received probation for possessing a stolen automobile, but violated the probation, and was previously convicted of battery. An additional case was opened against Padilla for aggravated battery to a peace officer, arising from the incident in which Padilla purportedly punched Gross, and Gross broke his own hand punching Padilla.

¶ 37    The PSI further stated that Padilla was seen by a psychiatrist, was diagnosed with bipolar disorder, and received treatment in the Cook County Department of Corrections, and that he had been previously diagnosed with behavioral and learning disorders.

¶ 38    Padilla drank alcohol every weekend and "limited his drinking to half a gallon of alcohol." He also used cannabis from the age of 13 to present, cocaine from ages 13 to 14, and codeine cough syrup from ages 15 to 17.

¶ 39    The parties presented arguments on Padilla's sentencing.

¶ 40    In aggravation, the State argued that Padilla was "unsafe," should receive a sentence enhancement for committing first degree murder with a firearm, and should remain in prison for natural life. The State observed that throughout the entire case, Padilla boasted about his membership with the La Raza gang and said they called him "Dangerous." The State also argued that there was no evidence showing Padilla had remorse or rehabilitative potential.

¶ 41    Then, the State outlined the factors regarding Padilla's youth. The State asserted, "[I]t's not like the Defendant just turned 17. He was actually less than two months from his 18th birthday when he killed Jalen in cold blood." As to "outside peer pressure or negative influences," the State stated that Padilla boasted about being a member of the gang La Raza, and that Padilla "even has a new tattoo" on his face "from when he first came in here." However, the State reminded the court that Padilla's current offense had nothing to do with "gang war" or "peer pressure," but rather, Padilla willfully killed a 17-year-old boy out of racist motives, bragged about it, and rapped about it in prison.

¶ 42    The State next addressed Padilla's family home environment and noted Padilla's close relationships with his mother and sister. Additionally, the State observed the lack of substance abuse or criminal history in Padilla's family, and Padilla's denial that he was ever abused or

neglected. The State emphasized that Padilla was expelled from high school for fighting, and he sold drugs to support himself. The State also argued that Padilla was able to meaningfully participate in his defense, as the trial evidence showed Padilla attempted to cover up the murder when he changed his clothes, discarded his firearm, and urinated on his hands. Padilla also changed his story multiple times, initially telling the detectives that he was at a McDonald's, then pleading insanity, then asserting self-defense. In discussing Padilla's prior juvenile or criminal history, the State observed that Padilla received probation for possession of a stolen motor vehicle, and violated his probation multiple times, before he killed Jalen 22 days later. Then, less than 24 hours after the murder, Padilla "pick[ed] up a new case" for aggravated battery for "what he did to Detective Aid Gross and ** Debora." The State referenced the various behavioral issues Padilla exhibited while in prison, stated that Padilla had spent at least "398 days in segregation" as a result, and asked, "How in the world can that be rehabilitative?" The State concluded that a natural life sentence was "the only just sentence."

¶ 43    In mitigation, the defense also addressed the factors regarding Padilla's youth, first arguing that Padilla suffered "cognitive disabilities, ADHD." The defense argued that Padilla was "psychotic" in prison, that he had a history of being medicated, and that he "was impulsive and had difficulty controlling impulsivity." Defense counsel also asserted that Padilla experienced outside peer pressure and negative influences, having had a father who abandoned him, a mother who struggled with alcoholism and was deported, and a grandfather who had provided stability but died. Padilla became involved with gangs "because that's who replaced his family that was no longer there." Additionally, defense counsel argued that Padilla had suffered trauma at a young age, having had to defend his mother from domestic abuse at a young age, and having been "nearly" or "possibly" raped as a child.

¶ 44    As to rehabilitative potential, defense counsel asserted that Padilla showed potential when he was in a stable environment. When guards told Padilla to stop fighting, "more often than not, he listened to them." Defense counsel explained that Padilla simply "wanted to be in segregation" because "jail is not a nice place," and Padilla lacked the "wherewithal to rise above the circumstances" in prison. Counsel concluded that Padilla had a "very minimal juvenile or criminal history," and "given his age of 17, given his background, given his psychological profile," Padilla should receive less than 35 years' imprisonment. Defense counsel claimed that "35 years would not deprecate the seriousness of the offense," but would still "give Alan a chance to rehabilitate and do something useful in his life."

¶ 45    Padilla stated in allocution that he "didn't mean for things to happen that day," and apologized to Jalen's family. He explained that all he needed "was a support system to direct me in the right direction; but things happen." Padilla then stated, "I live with this nightmare; and it haunts me daily; and again, I'm sorry to my victim family [*sic*], as well as I'm sorry for my own family, as well. And that's it."

¶ 46    The circuit court stated that it recalled the facts and circumstances of the case and that, "like the jury," it found Padilla's account of the event "completely incredible." The court described the severity of Padilla's offense, stating, "[T]his was the Defendant's conscious choice to find a victim, because he had been in an altercation with somebody else," and Jalen "just happened to be in the Defendant's sights." The court observed that the murder was not "brought on by sudden and tense passion or an uncontrollable impulse," but "was by design." Further, the court noted that Padilla saw Jalen with his mother, and decided to shoot Jalen, a 17-year-old boy who "wasn't carrying a gun, or a weapon, or gang insignia," but rather only carried "a bag of laundry for his family, to help out his [m]other."

¶ 47   The court also described the cruel effect of Padilla's offense on the victim's family, stating:

> "The unimaginable shock and pain that Jalen's [m]other suffered at the laundromat is unspeakable. The effect that his actions, his decisions had beyond the laundromat, is nothing that can be comprehended.
>
> What he's done to his own family, and what he's done to Jalen's family, and what he took away from Jalen, 17 years old, is beyond comprehension for us to truly understand it."

¶ 48   The court noted that Padilla was 17, so there were "some considerations that the Court must go through" in determining an appropriate sentence." As to the factors regarding Padilla's youth, the circuit court observed that Padilla chose to commit the murder, and was not "put up to [it] by older, more mature individuals who [held] sway over the Defendant." The court also stated that Padilla should have understood "the bond between a Mother and a Son" when he shot Jalen in front of his mother, since Padilla had lost his mother and grandfather. Additionally, court considered Padilla's "young age at the time of the offense," Padilla's "personal history, prior to the offense," all the factors in aggravation and mitigation, the PSI, and Padilla's conduct in prison.

¶ 49   The court raised Padilla's rehabilitative potential once when it stated the following:

> "So, what I'm left with, is to fashion an appropriate sentence that considers the vicious, horrendous murder of Jalen by the Defendant, another 17-year-old; and I'm required to consider the Defendant's youthfulness, his *rehabilitative potential* in doing that; and I certainly have.
>
> I've considered the fact that the Defendant is loved by his family, and the suffering that his own family is going to consider.

In fashioning a sentence appropriate in this case, I've considered the State's request for natural life; and that's an appropriate request, under the circumstances, that you serve the rest of your life without the possibility of parole." (Emphasis added.)

However, we note that the court made no express finding as to whether Padilla had rehabilitative potential.

¶ 50    The trial court found that the discretionary sentencing enhancement for discharging a firearm was "appropriate under the circumstances of this case." Thus, the court sentenced Padilla to 40 years imprisonment, with an enhancement of 25 years, for a total of 65 years' imprisonment.

¶ 51    Padilla filed a motion to reconsider his sentence. At the hearing on the motion, Padilla's counsel adopted the "previous argument at the sentencing hearing" and rested on it. The trial court found that Padilla's sentence was "appropriate," and denied Padilla's motion to reconsider "[b]ased on all the statutory factors in aggravation and mitigation as well as the material considered in the [PSI]." This appeal followed.

¶ 52    ANALYSIS

¶ 53    On appeal, Padilla argues that because he was a juvenile offender, the trial court was constitutionally prohibited from imposing a *de facto* life sentence unless it had determined that Padilla was "among the rarest of youth whose crimes reflect permanent incorrigibility." According to Padilla, the trial court made no such finding, and so the imposition of a *de facto* life sentence on Padilla violated the eighth amendment to the United States Constitution (U.S. Const., amend. VIII). The State responds that Padilla's discretionary *de facto* life sentence was constitutional because the trial court considered Padilla's youth and its attendant circumstances before determining that he was beyond rehabilitation.

¶ 54    The eighth amendment to the United States Constitution prohibits "cruel and unusual punishments" (U.S. Const., amend. VIII) and applies to the states through the fourteenth amendment (U.S. Const., amend. XIV). *Roper v. Simmons*, 543 U.S. 551, 560 (2005). In *Miller v. Alabama*, 567 U.S. 460, 479 (2012), the United States Supreme Court held that "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders" violates the eighth amendment. The Supreme Court reasoned that a mandatory life sentence precludes a trial court from considering the offender's youth and its "attendant circumstances," which include the offender's "immaturity" and "impetuosity," the offender's "failure to appreciate risks and consequences," the offender's family and home environment, the extent to which familial and peer pressures affected the offender's conduct, the offender's "inability to deal with police officers or prosecutors," and the offender's "incapacity to assist his own attorneys." *Id.* at 465, 477-78. The *Miller* Court stated that "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles," and a mandatory sentencing scheme unconstitutionally precludes this consideration. *Id.* at 489. Nonetheless, the *Miller* court also noted that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon," due to the "great difficulty" of distinguishing at an early age "between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the *rare juvenile offender whose crime reflects irreparable corruption*." (Emphasis added and internal quotation marks omitted.) *Id.* at 479-80.

¶ 55    Since *Miller*, the Illinois supreme court has clarified that a mandatory, *de facto* life-without-parole sentence was unconstitutional pursuant to *Miller* (*People v. Reyes*, 2016 IL 119271, ¶ 10), and that a prison sentence of over 40 years is a *de facto* life sentence implicating *Miller*.

(*People v. Buffer*, 2019 IL 122327, ¶¶ 41-42). In *People v. Holman*, 2017 IL 120655, ¶ 40, our supreme court found that *Miller* applies both to mandatory and discretionary life sentences.

¶ 56    The *Montgomery* court further stated that "a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.* ¶ 46. This is a finding that can only be made after considering the defendant's youth and its attendant circumstances. *Id.*

¶ 57    Our legislature has also since codified the considerations required by *Miller* through section 5-4.5-105 of the Code of Corrections (730 ILCS 5/5-4.5-105 (West 2018)), which sets forth each factor a sentencing court must consider, including "the person's potential for rehabilitation or evidence of rehabilitation, or both."

¶ 58    Padilla was convicted of first degree murder pursuant to section 9-1(a)(1) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(1) (West 2012)). Section 5-4.5-20 of the Code of Corrections (730 ILCS 5/5-4.5-20(a) (West 2012) provides that a person convicted under section 9-1 and sentenced to imprisonment shall receive a term "not less than 20 years and not more than 60 years." Further, section 5-8-1(d)(iii) (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2012)) provides that where the person personally discharged a firearm that proximately caused death to another person, "25 years or up to a natural life shall be added to the term of imprisonment imposed by the court." Section 5-4.5-105(c) of the Code of Corrections (730 ILCS 5/5-4.5-105(c) (West 2018)) states that, in addition to considering the factors regarding a juvenile defendant's youth, the trial court "may, in its discretion, decline to impose the sentencing enhancements based upon the possession or use of a firearm during the commission of an offense included in subsection (d) of Section 5-8-1." Pursuant to these provisions, the trial court in its discretion imposed a *de facto* life sentence, when

it sentenced Padilla to 40 years' imprisonment for first degree murder, with a 25-year enhancement for discharging the firearm that proximately caused Jalen's death.

¶ 59    It is undisputed that Padilla also received a *de facto* life sentence without parole. Section 3-6-3(a)(2)(i) of the Illinois Code of Corrections (730 ILCS 5/3-6-3(a)(2)(i) (West 2012)) provides that "a prisoner who is serving a term of imprisonment for first degree murder *** shall receive no sentence credit and shall serve the entire sentence imposed by the court." While the Illinois legislature has since set forth a graduated parole review system for any "person under 21 years of age at the time of the commission of first degree murder who is sentenced on or after June 1, 2019," this provision does not apply to Padilla, who was sentenced on July 10, 2017. P.A. 100-1182, § 5, eff. June 1, 2019 (730 5/5-4.5-115(b)).

¶ 60    We review *de novo* whether a sentence is constitutional. *People v. Taylor*, 2015 IL 117267, ¶ 11.

¶ 61    At the sentencing hearing, the parties spoke at lengths regarding Padilla's youth and its attendant circumstances, revealing the circumstances under which Padilla came of age. Padilla did not have a relationship with his father but was very close to his mother. He watched his mother suffer physical abuse from the men she dated. Padilla grew up on medication to address his ADHD, and the PSI showed that Padilla was diagnosed with bipolar disorder and had been previously diagnosed with behavioral and learning disorders.

¶ 62    The evidence also showed that, at a young age, Padilla may have been the victim of either attempted or actual rape. Also at a young age, he lost his two sources of stability, his mother and maternal grandfather, as his mother was deported and his grandfather died. The evidence further showed that upon losing his sources of support and stability, Padilla turned to gang activity. In imposing its sentence, the trial court considered these factors, as well as the factors regarding

Padilla's youth and how they affected the court's ultimate decision. The court additionally stated that it had considered Padilla's rehabilitative potential. However, the court made no express finding whether Padilla had rehabilitative potential, or whether his crime reflected permanent incorrigibility.

¶ 63    Our recent ruling in *People v. Paige*, 2020 IL App (1st) 161563, is instructive. In *Paige*, the defendant was convicted of first degree murder, home invasion, and residential burglary when, at the age of 16, he entered a man's apartment and stabbed the man with a kitchen knife over 10 times. *Id.* ¶¶ 5-10. At the sentencing hearing, the trial court considered the defendant's "age at the time of the offense and now," noting that the defendant "has not had an easy life having been raised a lot with a single parent," but that the defendant "did have a strong male role model." (Internal quotation marks omitted.) *Id.* ¶ 22. The court considered the defendant's "drug abuse, his mental condition, and his intellectual abilities," and considered the defendant was taking "alternative classes" and "doing well" in them. (Internal quotation marks omitted.) *Id.* ¶ 21. The court also described the brutality of the defendant's conduct, and stated there was "ample evidence of premeditation in this crime." (Internal quotation marks omitted.) *Id.*

¶ 64    However, while the trial court in *Paige* stated that it had "weighed [the defendant's] rehabilitative potential," the court did not expressly make any finding as to whether the defendant could be rehabilitated. (Internal quotation marks omitted.) *Id.* Nonetheless, the court imposed a sentence of 50 years' imprisonment, which consisted of 50 years for first degree murder, along with a concurrent sentence of 25 years for home invasion, and 15 years for residential burglary, which was to run concurrently with the first degree murder sentence and consecutively with the home invasion sentence. *Id.* ¶ 23.

¶ 65 On appeal, this court in *Paige* noted that while the trial court stated it had considered the defendant's rehabilitative potential, the trial court "did not consider whether defendant was beyond rehabilitation so that he is one of 'the rarest of juvenile offenders *** whose crimes reflect permanent incorrigibility.' " *Id.* ¶ 39 (quoting *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 734 (2016)). We held that "[w]here the trial court focused on the brutality of the crime and the need to protect the public, with no corresponding consideration given to defendant's opportunity for rehabilitation, the imposition of a life sentence on a juvenile defendant was unconstitutional." *Id.*

¶ 66 As in *Paige*, the trial court here considered Padilla's youth, and described the brutality of Padilla's crime in detail. Also as in *Paige*, the trial court stated that it had considered Padilla's rehabilitative potential, but made no finding as to whether Padilla "was beyond rehabilitation so that he is one of the rarest of juvenile offenders *** whose crimes reflect permanent incorrigibility." (Internal quotation marks omitted.) *Id.*

¶ 67 As Illinois courts have recognized, rehabilitative potential is at the heart of the requirements of *Miller*, as juveniles specifically exhibit "lesser moral culpability and greater rehabilitative potential." *People v. Aikens*, 2016 IL App (1st) 133578, ¶ 24. A life sentence without parole, however, implies that "under any circumstances" a juvenile offender "is incorrigible and incapable of rehabilitation for the rest of his life." *People v. Miller*, 202 Ill. 2d 328, 342-43 (2002).

¶ 68 We recognize the brutal nature of Padilla's offense, as described in the evidence presented at trial. We also acknowledge the trial court's thoughtful consideration of the seriousness of the offense, the evidence presented regarding Padilla's racist motives, and the impact Padilla had on the victim's family. However, Illinois law mandates that the trial court could not impose a *de facto* life sentence without parole on Padilla without first making a finding that Padilla was among "the

rarest of juvenile offenders *** whose crimes reflect permanent incorrigibility." *Montgomery*, 577 U.S. at ___, 136 Sup. Ct. at 734. Because this finding was not made, we must reverse the sentence imposed by the trial court, and remand the case for a hearing on whether Padilla lacks any rehabilitative potential. Because we are reversing the trial court's judgment on this ground, we make no finding as to whether Padilla does or does not have rehabilitative potential, whether his sentence violated the proportionate penalties clause of the Illinois Constitution, or whether the provisions under which he was sentenced are unconstitutional.

¶ 69     CONCLUSION

¶ 70     For the foregoing reasons, we reverse and remand the judgment of the trial court.

¶ 71     Reversed and remanded, with instructions.